UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X    FOR PUBLICATION
                                                                    :
In re:                                                              :    Chapter 11
                                                                    :    Case No.: 08-14604
BH S&B HOLDINGS LLC, <u>et al</u>.,                                 :    Jointly Administered
                                                                    :
                                        Debtors.                    :
                                                                    :
------------------------------------------------------------------- X

**MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART
MOTION TO COMPEL DEBTORS TO REMOVE MECHANICS' LIENS**

*A P P E A R A N C E S:*

Kevin J. Burke
Cahill Gordon & Reindel LLP
80 Pine Street
New York, NY 10005
(212) 701-3000
*Counsel for the Debtors*

Robert M. Hirsh
Arent Fox LLP
1675 Broadway
New York, NY 10019
(212) 484-3900
*Counsel for the Official Committee of Unsecured Creditors*

Stephanie Goldstein
Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004
(212) 859-8000
*Counsel for VNO 100 West 33rd Street LLC & Vornado 692 Broadway LLC*

**MARTIN GLENN,
United States Bankruptcy Judge**

  Pending before the Court is Vornado 692 Broadway LLC's and VNO 100 West 33rd

Street LLC's (together, "Vornado") motion and amended motion to compel the Debtors to

remove mechanics' liens from two properties owned by Vornado and leased by the Debtors, or,

in the alternative, to compel the Debtors to indemnify Vornado against the liens. For the reasons explained below, the motion is granted in part and denied in part.

## BACKGROUND

Steve & Barry's was a specialty retailer of apparel and accessories. (ECF Doc. #30 ¶ 5.) The company operated out of many stores, two of which, located in New York City at 692 Broadway and 100 West 33rd St., were owned by Vornado. The 692 Broadway lease was signed on December 28, 2007, and the 100 West 33rd lease was signed on May 1, 2005. On July 9, 2008, Steve & Barry's filed a chapter 11 petition. (Case No. 08-12579 (ALG).) On August 22, 2008, and by order of the court on that day, the company entered into an agreement to sell substantially all of its assets to the current Debtors. (No. 08-12579 (ALG), ECF Doc. #628-1 ¶ 16.) On August 25, 2008, in connection with that agreement, the Debtors assumed a number of leases, including the two at issue in this case, and continued to operate the stores. (No. 08-12579 (ALG), ECF Doc. #628-3, § 4.1) The agreement provided that the leases were assumed free and clear of all liens and encumbrances.

The leases required the tenant to "keep the Building, the Premises and this Lease free from any mechanics, materialmans or similar liens or encumbrances, and any claims therefore, in connection with any Work." Furthermore, the leases provided that if a lien is filed, the tenant is obligated to "remove any such lien or encumbrance by bond or otherwise within sixty (60) days after notice from Landlord. If Tenant fails to do so, Landlord may pay the amount or take such other action, as Landlord deems necessary to remove such lien or encumbrance, without being responsible for investigating the validity thereof. The amount so paid and costs incurred by Landlord shall be deemed additional Rent under this Lease payable upon demand, without limitation as to other remedies available to Landlord." Finally, the leases also provided that the

2

Debtors must indemnify Vornado against any liens that may attach to the properties.  The Debtors admit that they were obligated to perform under the leases.

Before the Debtors assumed the two leases (when the two stores were still being operated by Steve & Barry's), and over the course of the following six months, numerous mechanics' liens were recorded against the two properties:

| DATE OF LIEN FILING | LIENHOLDER | AMOUNT | PROPERTY |
|---|---|---|---|
| August 11, 2008 | Kleinknecht Electric Co. | $15,245.48 | 100 West 33rd |
| August 11, 2008[1] | Kleinknecht Electric Co. | $15,245.48 | 100 West 33rd |
| November 17, 2008 | B.R. Fries & Associates | $1,217,724.10 | 692 Broadway |
| December 19, 2008 | Secure Door and Hardware | $11,542.56 | 692 Broadway |
| December 22, 2008 | Lab Plumbing & Heating Co. | $19,440 | 692 Broadway |
| December 23, 2008 | Excel Flooring of Tri-State | $94,215.40 | 692 Broadway |
| December 26, 2008 | Marjam Supply Co. | $21,689.05 | 692 Broadway |
| January 12, 2009 | ANR Mechanical Corp. | $36,000 | 692 Broadway |

The Debtors filed their chapter 11 petitions on November 19, 2008, and continued to operate these two stores.  On November 25, 2008, the Court signed an order outlining procedures that would allow the Debtors to reject nonresidential leases for all of their locations.  (ECF Doc. #80.)  On January 6, 2009, the Debtors filed a Notice of Rejection of Executory Contracts or Unexpired Leases of Nonresidential Real Property.  (ECF Doc. #237.)  The notice provided that the two Vornado properties, among many others (including other Vornado properties), would be rejected as of January 16, 2009.  (*Id.*)  On January 15, 2009, Vornado filed a response to the

---

[1]     These two liens are actually for the same work: one was filed against the property, the other filed against the leasehold.  The Court will treat them separately for purposes of this opinion.

notice of rejection[2] and a companion motion to compel the Debtors to perform postpetition lease obligations, pursuant to Bankruptcy Code § 365(d)(3), with respect to the mechanics' liens described above.[3] (ECF Docs. #267, 268.) Specifically, Vornado argues that the Debtors should be compelled to remove all of the above liens, or, in the alternative, to indemnify Vornado against the liens. The Debtors filed a timely objection (ECF Doc. #298), Vornado filed a reply in further support of its motion (ECF Doc. # 315), and oral argument was heard on February 3, 2009. For the reasons explained below, Vornado's motion is granted in part and denied in part to the extent provided herein.

## DISCUSSION

### A.    Section 365(d)(3)

Section 365(d)(3) provides that "the trustee shall timely perform all obligations of the debtor . . . arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title." The consequences of violating § 365(d)(3) have developed on a case-by-case basis, but many courts have held that the landlord would be entitled to an administrative expense claim under such circumstances. 3 COLLIER'S ON BANKRUPTCY ¶ 365.04[3][g] (15th ed. rev. 2005).

On its face, § 365(d)(3) only applies to obligations under a nonresidential lease that arise postpetition and pre-rejection. Indeed, "Congress enacted [§ 365(d)(3)] to ameliorate the perceived inequities that lessors of nonresidential real property had faced during the period after a Chapter 11 filing but before assumption or rejection." *In re Stone Barn Manhattan LLC*, 398 B.R. 359, 361 (Bankr. S.D.N.Y. 2008) (Gropper, J.). The word "obligation" is not defined in the

---

[2]  In its response, Vornado did not object to the rejection of the leases, but it reiterated the arguments in its motion to compel.

[3]  Vornado filed an Amended Motion (ECF Doc. #296) to add two additional liens it discovered after it filed its motion.

4

Code. "[I]t is thus apparently used in its commonly understood sense. Black's Law Dictionary defines it as '[t]hat which a person is bound to do or forebear; any duty imposed by law, promise, contract, relations of society, courtesy, kindness, etc.'" *CenterPoint Props. v. Montgomery Ward Holding Corp.* (*In re Montgomery Ward Holding Corp.*), 268 F.3d 205, 209 (3d Cir. 2001) (citing BLACK'S LAW DICTIONARY 968-69 (5th ed. 1979)); *see also In re McCrory Corp.*, 210 B.R. 934, 939 (S.D.N.Y. 1997) (finding that while use of the word "obligations" may be unambiguous, the language of § 365(d)(3) was "far from clear"). The Debtors' duties to Vornado here are undoubtedly obligations, since they arose under a valid contract. The only question then is when these obligations arose.

The Debtors rely on the Arizona bankruptcy court's recent decision in *In re Designer Doors, Inc.*, 389 B.R. 832 (Bankr. D. Ariz. 2008), to argue that all of the obligations they owe Vornado are either prepetition or post-rejection and so fall outside the scope of § 365(d)(3). In *Designer Doors*, a nonresidential lease contained the same two clauses at issue here: one requirement to keep the property free of liens and encumbrances and another to indemnify the landlord against any liens that may be filed. Prepetition, the debtor contracted with a dry-wall company to make improvements to the property but failed to pay it. The debtor then filed a chapter 11 petition. Five days after the petition was filed, the dry-wall company filed a mechanic's lien against the property. Three months later, but before the debtor rejected the lease, the dry-wall company filed suit against the landlord seeking to foreclose on the property and for attorneys' fees. The landlord spent $3,992 defending the suit. The landlord then filed an administrative expense claim against the debtor for removing the liens, paying the attorneys' fees, and indemnifying it against the liens.

5

The court, relying on Arizona state law, held that because the improvements on the property were made prepetition, the mechanic's lien was a prepetition obligation not covered by § 365(d)(3). *Id.* at 836-37 (citing A.R.S. § 33-983(A) ("A person who furnishes professional services or material or labors . . . shall have a lien on the lot or parcel of contiguous land . . . for professional services or material furnished and labor performed.")).  The court further held that the timing of when the indemnification obligation arises depends on when the lease obligates payments. *Id.* at 841.  As a result, the attorneys' fee obligation arose at the time the landlord incurred it—*i.e.*, postpetition and pre-rejection—and was entitled to be treated as an administrative claim. *Id.* at 842.  The indemnification against the lien claim, however, "either arose when the lien arose or when the landlord suffered a loss on account of the lien (probably the latter)." *Id.*  Because the "tenant breached its obligation to *keep the premises free from such liens* the moment the work began to be performed," the obligation arose prepetition. *Id.* (emphasis in original).

The Court finds the analysis in *Designer Doors* compelling and follows it to a large degree, but because the statutory predicates for mechanics' liens are different in New York and in Arizona, the Court reaches a different result.  Specifically, in contrast to Arizona where mechanics' liens arise at the time the work is performed, in New York a mechanic's lien arises "from the time of filing a notice of such lien." N.Y. LIEN LAW § 3.  "This means that the filing of the notice is the act which creates the lien, and there is no lien prior to such filing." 16 CARMODY-WAIT 2d § 97:59 (2008).  As a result, the Court must look to the time of the lien filing to determine when the obligation to remove the lien arose.

6

**B.     Duty to Remove Liens**

*1.     Application of § 365(d)(3)*

The Court initially rules that Vornado has no claim against the Debtors for the two Kleinknecht liens, which were filed before the Debtors assumed the lease on 100 West 33rd Street. Under the asset purchase agreement and the court order approving it, the Debtors assumed that lease free and clear of all liens and encumbrances, including the two Kleinknecht liens, which were filed two weeks before the assumption date.

In any event, § 365(d)(3) does not apply to the two Kleinknecht liens and the Fries lien because they all were filed prepetition. Under New York law, a lien arises at the time of filing; therefore, the Fries lien is a general, unsecured claim that Vornado has against the estate. Vornado argues that § 365(d)(3) applies to all three of these liens, notwithstanding that they were filed prepetition (and the Debtors assumed the leases free and clear of the Kleinnecht liens), because the obligation to remove these liens arises from the language in the lease providing the tenant with 60 days to cure the default once notice is provided by the landlord. In essence, Vornado reads two distinct obligations into the lease, arising at different times: one to keep the property free and clear of liens and encumbrances, and another to remove the lien or indemnify against the lien once a lien is filed and notice is given. According to this reading, prepetition the Debtors breached their obligation to keep the property free and clear of liens, but also breached an independent obligation to remove the lien once they received notice during the postpetition, pre-rejection period covered by § 365(d)(3). It is for this latter obligation that Vornado seeks an administrative expense claim.

The Court disagrees with this reading. Vornado's reading would render a non-sensical result: the obligation to keep the property free and clear of liens would have no meaning if it

7

was not triggered by the actual filing of the lien.[4] The Court views the notice and cure provision as not creating separate obligations, but rather providing the methods for curing the breach of a preexisting obligation. Under this reading, the obligation to keep the property free and clear of liens arose when the liens were filed. The Debtors assumed the leases free and clear of the previously filed Kleinknecht liens. The Fries lien became a prepetition, general unsecured claim when the lien was filed on November 17, 2008, two days before the chapter 11 petitions were filed.

The other liens were all filed postpetition and pre-rejection, and so fall within the scope of § 365(d)(3). The Debtors argue that, under the leases, their obligation to remove the liens only arises 60 days after receiving notice from Vornado. Since Vornado provided notice to the Debtors of all of these liens by way of this motion, and the 60-day period would expire after the rejection date, the Debtors argue that the obligation to remove the liens arises after the rejection date, making § 365(d)(3) inapplicable.[5]

For the same reason that the Court rejected Vornado's argument that the prepetition liens were postpetition obligations by virtue of the notice provision in the lease, the Court similarly rejects the Debtors' argument that this same clause transforms these postpetition, pre-rejection liens into post-rejection obligations outside the scope of § 365(d)(3). Vornado's argument ignores the plain language of the lease; the Debtors' argument ignores the plain language of § 365(d)(3). Section 365(d)(3) applies whenever the obligation to perform "arises," not when it matures into a cause of action. Here, the lease plainly provides that the Debtors "shall keep the

---

[4] Vornado also argues that the clause requiring the Debtors to keep the property free and clear of liens is not an obligation, but a covenant. This argument ignores the plain language of the lease which provides that the tenant "*shall* keep" the premises free and clear of liens. The use of the auxiliary verb "shall" creates an obligation to perform.

[5] Vornado added two of the liens—the ANR Lien and the Marjam Lien—in its amended motion filed on January 29, 2009, after the rejection date.

8

Building, the Premises and this Lease free from any mechanics, materialmans, or similar liens or encumbrances . . . ." The obligation to remove the liens arose when they were filed.

The Debtors also argue that these liens are really prepetition obligations because the work giving rise to the liens was all performed prepetition. But this ignores the plain language of New York's Lien Law, which provides that the lien arises at the time of filing. The Debtors provide no authority applying New York law to support their "relate-back" theory as to when the obligation to keep the property free and clear arose. Indeed, Judge Sweet in *Urban Retail Props. v. Loews Cineplex Entmt. Corp.*, 2002 WL 535479 (S.D.N.Y. Apr. 9, 2002), rejected a similar argument. Judge Sweet held that because a lease obligation to reimburse arose postpetition, it was covered by § 365(d)(3), even though the creditor was seeking reimbursement for work performed prepetition. *Id.* at *5-6.

In sum, the Court concludes that under the leases and § 365(d)(3), the Debtors' obligation to keep the premises clear of liens arose when the liens were filed. As a result, the Fries lien is a prepetition, general unsecured claim, and the Secure Door and Hardware, Lab Plumbing & Heating Co., Excel Flooring, Marjam Supply, and ANR Mechanical liens are all postpetition, pre-rejection obligations subject to § 365(d)(3).

## 2.   *Classification of Postpetition, Pre-Rejection Obligations*

Section 365(d)(3) does not provide a remedy for a violation by the debtor. According to Collier's, "[a] majority of courts interpret section 365(d)(3) as granting the lessor automatic administrative expense treatment, independent of section 503(b), which ordinarily governs allowance of administrative expenses, for the amount called for by the lease." 3 COLLIER'S ON BANKRUPTCY ¶ 365.04[3][g][ii]. Most courts reaching this conclusion focus on the language in § 365(d)(3) obligating the trustee to perform all postpetition pre-rejection obligations under the

9

lease, "notwithstanding section 503(b)(1) of this title." 11 U.S.C. § 365(d)(3). Section 503(b)(1) governs the allowance of administrative claims. Therefore, courts typically hold that, when confronted with a § 365(d)(3) violation, a court should not employ the typical § 503(b)(1) analysis in determining whether the claim is an administrative expense; such a classification is automatic.

Judge Brozman reached this conclusion in interpreting the classification of a claim for postpetition rent. *In re Wingspread Corp.*, 116 B.R. 915 (Bankr. S.D.N.Y. 1990). There, she noted that courts were almost unanimous in holding that such claims are administrative expenses. *Id.* at 925. Focusing on the language "notwithstanding section 503(b)(1) of this title," Judge Brozman stated:

> I read "notwithstanding section 503(b)(1)" as meaning that irrespective of whether the payments required under the lease meet the usual requirements for administrative status, reasonableness and benefit to the estate, they are unconditionally due (unless the landlord has engaged in some act which warrants reduction, denial or deferral of payment). By requiring the trustee to pay "all obligations of the debtor," Congress could not have meant for the court to look into the reasonableness of the obligations or the extent to which the debtor utilized the premises during the 60 day period, for otherwise Congress would not have said *all* obligations.

*Id.* (emphasis in original).

While *Wingspread* involved payment of rents (indeed, most cases interpreting § 365(d)(3) involve rent payments), the legislative history of the section indicates that the timing of § 365(d)(3) applies not just to rent. "The bill would lessen these problems by requiring the trustee to perform all the obligations of the debtor under a lease of nonresidential real property *at the time* required in the lease. This timely performance requirement will insure that debtor-tenants pay their rent, common area, and *other charges* on time pending the trustee's assumption

10

or rejection of the lease." 130 Cong. Rec. S8894, S8895 (daily ed. June 29, 1984) (statement of Sen. Hatch) (emphasis added).

A minority of courts have held that while § 365(d)(3) requires the timely performance of lease obligations, a lessor is not entitled to automatic administrative expense status. Rather, "[t]hese courts require notice and a hearing before granting the lessor administrative priority and require the lessor to establish its right to an administrative claim by showing the value of the benefit received by the estate during the 60-day period." 3 COLLIER'S ON BANKRUPTCY ¶ 365.04[3][g][ii] (citing *In re Orvco, Inc.*, 95 B.R. 724 (BAP 9th Cir. 1989); *In re Gatti's, Inc.*, 164 B.R. 929 (Bankr W.D. Tex. 1995)). Judge Brozman rightly distinguished *Orvco*, noting that its reasoning is at odds with the plain language of the statute and the legislative history. *Wingspread*, 116 B.R. at 925-26. In addition, Collier's notes that "[t]his approach seems to fail to give effect to the language of section 365(d)(3)"; namely, the "notwithstanding section 503(b)(1)" language. *Id.* 3 COLLIER'S ON BANKRUPTCY ¶ 365.04[3][g][ii].

The Court follows the majority rule and holds that the claims for removing the liens that arose postpetition and pre-rejection are administrative expense claims under § 365(d)(3). This approach is consistent with the language of § 365(d)(3), the legislative history of the statute, and case law in this jurisdiction interpreting the statute. The classification is automatic, and Vornado is not obligated to prove its entitlement to administrative expense status by notice and a hearing under § 503(b)(1).

### C. Duty to Indemnify

The question of when the duty to indemnify arises is less clear. But the Court rejects the argument that the notice clause in the lease triggers the indemnification obligation. The Court concludes that the lease provisions allowing the Debtors to remove a lien within 60 days after

11

receiving notice from Vornado, or having failed to remove the lien within that time period, to indemnify Vornado for doing so, are not independent obligations. Rather, the provisions provide two means for the landlord to assure that the tenant cures the breach of its obligation to keep the property free of liens. The filing of a lien, rather than notice of the lien from Vernado, gives rise to the obligation to indemnify, even though Vernado must wait 60 days after giving notice before acting itself to remove the lien if the tenant fails to do so.

The Debtors rely on a line of cases that hold that indemnification agreements give rise to prepetition contingent claims to argue that the duty to indemnify is a prepetition general unsecured claim. *See In re Manville Forest Prods. Corp.*, 209 F.3d 125, 129 (2d Cir. 2000) ("Under contract law, a right to payment based on a written indemnification contract arises at the time the indemnification agreement is executed."); *In re Oneida Ltd.*, 383 B.R. 29, 43 (Bankr. S.D.N.Y. 2008) ("[I]f the parties had an indemnification agreement prepetition, then the right to compel indemnification is treated as a prepetition claim, even if the remedy only became available post-petition."); *In re Houbigant, Inc.*, 188 B.R. 347, 359 (Bankr. S.D.N.Y. 1995) ("Because the ACB License Agreement was executed pre-petition, any claim arising out of ACB's contractual right to indemnification is a pre-petition unsecured claim."). But these cases all deal with when the *claim for indemnification* arose, not when the *obligation to indemnify* arose, which makes all the difference under § 365(d)(3). As noted above, the use of the word "obligation" in § 365(d)(3) is deliberate; in the bankruptcy context, a landlord's contingent unliquidated *claim* may arise long before his tenant has an *obligation* to do anything about it.

Similarly, the Court does not find the decision in *Designer Doors* compelling on the question of when the obligation to indemnify arose. The Debtors argue that the court in *Designer Doors* concluded that an obligation to indemnify did not arise until the landlord made a

12

payment regarding the lien. The court stated that the indemnification obligation "either arose when the lien arose or when the landlord suffered a loss on account of the lien (and probably the latter)." *Designer Doors*, 389 B.R. at 842. Because the lien arose prepetition and the landlord suffered a loss post-rejection, the court concluded § 365(d)(3) did not apply to the obligation to indemnify. *Id.* But *Designer Doors* is based on Arizona law, which is significantly different from New York law. Here, unlike in *Designer Doors*, New York law dictates that six of the liens arose *postpetition and pre-rejection*, making this part of the *Designer Doors* ruling inapposite. In any event, even if the court in *Designer Doors* did reach the conclusion the Debtors here advocate, the argument confuses the difference between an *obligation to indemnify* and a *cause of action for indemnification*. Vornado would not have a cause of action against the Debtors for damages for indemnification until Vornado suffered a judgment or made a payment on the mechanics' liens; that does not mean that the Debtors did not have a preexisting obligation to indemnify Vornado.[6]

The Court concludes that the obligation to indemnify arose when the liens attached to the properties. As the cases cited above make clear, Vornado obtained a contingent claim for indemnification against the Debtors when the Debtors assumed the leases and entered into a contract with Vornado. That claim became an obligation when the contingency was triggered; *i.e.*, when the liens attached to the property. The obligation to indemnify would become a cause of action for damages for indemnification if and when Vornado makes a payment to satisfy the liens, something that has not yet occurred. As a result, just as § 365(d)(3) applies to the Debtors' obligation to keep the property free and clear of liens, it applies with equal force to the Debtors' obligation to indemnify Vornado against the liens.

---

[6] Indeed, were it otherwise, the cause of action would make no sense; the very purpose of bringing a cause of action for indemnification is to vindicate a preexisting obligation to remove the liens.

13

The Court also finds Judge Sweet's conclusion in *Urban Retail*, 2002 WL 535479, persuasive on this issue. In *Urban Retail*, American National Bank, the landlord, and Skokie, the debtor, entered into a lease to occupy theater space. Under the agreement, Urban Retail, a third party, agreed to build a new movie theater on the premises at its own expense, subject to reimbursement of $1 million from Skokie on or before the day the theater opened for business. The lease was signed in 1999; Urban began construction prepetition in 2000; the debtor filed for bankruptcy on February 15, 2001; Urban completed construction in April 2001; the theater opened for business on May 25, 2001; and on June 14, 2001, Urban sent a demand letter to the debtor demanding reimbursement. When the debtor refused to pay, Urban filed a motion to compel payment under § 365(d)(3).[7] *Id.* at *1.

Judge Sweet, reversing the bankruptcy court, held that § 365(d)(3) applied to the debtor's obligation to reimburse Urban because it arose postpetition, pre-rejection. *Id.* at *5. The court rejected the debtor's argument that because the costs associated with the obligation to reimburse arose prepetition, § 365(d)(3) should not apply. The court reasoned that because most cases applying the "proration" approach involve periodic payments, like rent or taxes, it made no sense to require Urban to show that the work it performed was "fairly related" to the postpetition, pre-rejection period. *Id.* at *6-7. The case, instead, involved a "one-time capital expense obligation to be paid at [a] date contingent on the completion of construction and the opening of the tenant's operations." *Id.* at *7. And it was the occurrence of that contingency during the postpetition, pre-rejection period that triggered application of § 365(d)(3):

> [T]he Debtor's obligation was specifically bargained for to be
> contingent upon a future event, i.e., the completion of the theater
> complex construction and subsequent opening for business. As
> these triggering events would not have been reached had the

---

[7] Because the lease was not scheduled to be rejected until confirmation, the post-rejection prong of § 365(d)(3) was not implicated in *Urban Retail*.

14

> Debtor ceased operations post-petition, the Debtor's obligation
> related to its post-petition operations.

*Id.* at *8. As a result, even though Urban Retail may have had a claim for reimbursement prepetition, because the lease obligated payment postpetition, pre-rejection, §365(d)(3) applied.

The Court follows this approach and reaches the same conclusion. Vornado's indemnification claim is analogous to the reimbursement claim in *Urban Properties* in that it is not a periodic payment like rent or taxes, but a one-time obligation to indemnify. Prepetition, Vornado had a contingent claim against the Debtors for indemnification in the event a lien attached to the properties. That contingency occurred postpetition and pre-rejection, when the mechanics' liens attached to the property. That event triggers application § 365(d)(3) and converts Vornado's claim for indemnification into an administrative expense claim.

## CONCLUSION

For the reasons explained above, the Debtors' obligation to remove the Fries lien is a prepetition general unsecured claim. Similarly, the Debtors' obligation to indemnify against that lien is also prepetition general unsecured claim. The Debtors assumed the leases free and clear of the Kleinknecht liens and therefore have no obligation to remove those liens. The Debtors' obligation to remove the Secure Door and Hardware, Lab Plumbing & Heating Co., Excel Flooring of Tri-State, Marjam Supply Co., and ANR Mechanical Corp. liens are administrative expense claims. Consistent with § 365(d)(3), the Debtors must comply with their obligations under the respective leases and either remove the liens or indemnify Vornado against them.

Vornado shall settle an order consistent with this opinion.

//
//
//
//
Dated: February 10, 2009
New York, New York

       **/s/Martin Glenn**      
MARTIN GLENN
United States Bankruptcy Judge