**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| BH S&B HOLDINGS LLC, <u>et al</u>., | ) Case No. 08-14604(MG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) |

**STIPULATION AND AGREED ORDER**
**AMONG DEBTORS, COMMITTEE AND LENDERS**
**SETTLING VARIOUS DISPUTES AND PROVIDING FOR**
**DISTRIBUTION OF FUNDS AND PAYMENT OF ADMINISTRATIVE EXPENSES**

Upon consideration of the joint emergency motion (the "**Motion**") of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") and the official committee (the "**Committee**") of unsecured creditors appointed in the Debtors' chapter 11 cases (the "**Cases**") for approval and entry of this stipulation and agreed order among the Debtors, the Committee and the Lenders (as defined below) settling various disputes and providing for distribution of certain funds and payment of administrative expenses;

**THE COURT HEREBY FINDS:**

A.     On November 19, 2008 (the "**Petition Date**"), the Debtors  filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**").

B.     No trustee or examiner has been appointed in the Cases.

C.     An official committee of unsecured creditors (the "Committee") was appointed on November 26, 2008.

D.      On November 24, 2008, the Court entered that certain "Interim Order (A) Authorizing The Debtors To Obtain Super-Priority Senior Secured PostPetition Financing, (B) Providing Adequate Protection, (C) Prescribing Form and Manner of Notice and Setting The Time For The Final Hearing" [Docket # 78] (the "**Interim DIP Order**").[1]  Subject to the terms and provisions of the Interim DIP Order, the Debtors obtained $60 million of debtor-in-possession financing (the "**DIP Facility**") through January 10, 2009.

E.      On January 5, 2009, the Post-Petition Agent and the Post-Petition Lenders (in each case, as defined in the Interim DIP Order) terminated the DIP Facility.

F.      On January 7, 2009, the Debtors and the Committee filed an emergency motion (the "**Emergency Motion**") for the use of cash collateral, which was opposed by the Lenders.[2]  The hearing on the Emergency Motion was continued by the Court to permit the parties an opportunity to reach a consensual resolution concerning the Emergency Motion. The Debtors, the Lenders and the Committee were able to reach a resolution to the Emergency Motion and related disputes which was memorialized in that certain "Agreed Order Authorizing Debtors To Utilize Cash Collateral And Granting Other Agreed-Upon Relief" [Docket # 251], which was approved by the Court on January 8, 2009 (the "**January 8th Cash Collateral Order**").

G.      Under the January 8th Cash Collateral Order, in exchange for a general release, a waiver of claims for surcharge under section 506(c) of the Bankruptcy Code, and

---

[1]  Capitalized terms not otherwise defined in this Order shall have the meaning ascribed to them in the Interim DIP Order.

[2]  The term "**Lenders**" shall mean and include the Post-Petition Agent, the Post-Petition Lenders, the Pre-Petition Revolving Credit Agent and the Pre-Petition Revolving Lenders.

certain other entitlements and consideration set forth therein, the Lenders agreed to fund or to allow the use of certain cash (and did fund and allow use of, as applicable) an additional $5,000,000 (the "**Lender Payment**") into the Debtors' estates and consented to the use of other cash collateral (discussed further in Paragraph H below), in each case, for the purposes and uses and subject to the limitations specified therein. With regard to the Lender Payment, $1,000,000 of the Lender Payment was to be (and was in fact) wired directly to a separate escrow account (the "**Litigation Fund**") to fund all fees and expenses of the estates' prosecution of the Litigation Claims,[3] and the Debtors, the Committee and the Lenders agreed to the following allocation with respect to any and all recoveries on account of the Litigation Claims (the "**Litigation Recoveries**"): (1) with respect to the first $1,000,000, 100% to the Lenders; (2) with respect to the next $1,250,000, 80% to the Lenders and 20% to the Debtors' estates for the sole and exclusive benefit of general unsecured creditors; (3) with respect to the next $1,250,000, 70% to the Lenders and 30% to the Debtors' estates for the sole and exclusive benefit of general unsecured creditors; (4) with respect to the next $1,250,000, 60% to the Lenders and 40% to the Debtors' estates for the sole and exclusive benefit of general unsecured creditors; and (5) with respect to any and all remaining recoveries, 50% to the Lenders and 50% to the Debtors' estates for the sole and exclusive benefit of general unsecured creditors. (The portion of the Litigation Recoveries allocable to the Debtors' estates for the sole and exclusive benefit of general unsecured creditors under

---

[3] The term "**Litigation Claims**" means and includes any and all claims and causes of action of the Debtors and their estates (including, without limitation, any and all avoidance action claims and causes of action under chapter 5 of the Bankruptcy Code) or otherwise, other than any claims which relate exclusively to the recovery of payments made by the Stone Barn Debtors (as defined in Paragraph 4(c) below).

the January 8th Cash Collateral Order shall hereinafter be referred to as the "**GUC Litigation Recoveries.**")  Under the January 8th Cash Collateral Order, the Lenders were granted Post-Petition Litigation Liens (as defined in the January 8th Cash Collateral Order) in the Litigation Claims (and the proceeds, rents and products and profits thereof) to secure their rights, title and interests in the Litigation Recoveries.

H.      The January 8th Cash Collateral Order permitted the Debtors to use certain funds (constituting the Lenders' cash collateral) to complete their then-pending liquidation and wind-down pursuant to the terms of a budget attached to the January 8th Cash Collateral Order (the "**January 8th Budget**"), provided that any and all other cash and cash equivalents of the Debtors would be remitted back to the Lenders within a reasonable time after the payment of all expenses expressly itemized in the Budget, and applied to reduce the Pre-Petition Revolving Credit Obligations and Post-Petition Obligations in accordance with the provisions of the Interim DIP Order.  The January 8th Cash Collateral Order also provided that to the extent funds became available, the Debtors would be entitled to use such amounts to cover any additional expenses.

I.      Certain disputes arose among the Debtors, the Lenders and the Committee concerning the January 8th Cash Collateral Order, specifically including, without limitation, whether the Debtors and their estates had the right to use certain funds in which the Lenders asserted an interest (including, without limitation, certain funds that the Lenders assert were not previously disclosed to the Lenders), whether the Debtors and their estates had the ability to use any amounts to fund items that were not expressly included in the January 8th Budget, whether the Debtors and their estates had the right to use any amounts for any purpose whatsoever after February 28, 2009, and whether the Debtors and their estates were obligated

to promptly return to the Lenders any and all funds in the Debtors' possession as of March 1, 2009 (collectively, the **"Cash Collateral Disputes"**).  For several months, the Debtors, the Lenders and the Committee attempted to address and resolve the Cash Collateral Disputes informally.

J.       On July 7, 2009, the Lenders filed that certain "Motion Of Ableco Finance LLC For An Order Converting The Debtors' Chapter 11 Bankruptcy Cases To Cases Under Chapter 7 Of The Bankruptcy Code" [Docket # 472] (the "**Conversion Motion**") and certain related papers in support thereof [Docket #s 471, 473, and 473].  On July 21, 2009, the Debtors filed an objection to the Conversion Motion, and on July 22, 2009, the Committee filed an objection to the Conversion Motion [Docket #s 481 and 484].

K.       On July 28, 2009, the Court conducted a preliminary hearing on the Conversion Motion, at which hearing the Court scheduled an evidentiary hearing for September 15, 2009.

L.       On July 24, 2009, the Debtors filed that certain "Debtors' Motion for Authority to Transfer Their Funds to New Bank Accounts" [Docket # 486] (the "**Bank Account Transfer Motion**") pursuant to which the Debtors sought to transfer the Lenders' cash collateral out of the Debtors' bank accounts maintained with JPMorgan Chase Bank, N.A. ("**Chase**"), some of which continue to be subject to control agreements in favor of the Lenders which limit the Debtor's ability to control, access, withdraw or transfer funds without the consent of the Lenders.  On August 7, 2009, the Lenders and Chase filed objections to the Bank Account Transfer Motion [Docket #s 497 thru 501].  The Bank Account Transfer Motion is scheduled to be heard on September 15, 2009.

M.     This Court having jurisdiction to consider the Motion in accordance with 28 U.S.C. §§ 157 and 1334; and upon the agreement of the Debtors, the Lenders and the Committee, this Court having found that good and sufficient cause exists for granting the relief herein and that the relief granted herein is necessary to avoid immediate and irreparable harm, as contemplated by Bankruptcy Rules 4001 and 6003; and upon the record of these chapter 11 cases including, without limitation, the hearing on the Motion; and it appearing that the relief granted herein is appropriate in the context of these Cases and is in the best interests of the Debtors and their respective estates, their creditors, and all other parties-in-interest; and any objections to the Motion having been resolved, withdrawn, or overruled; and upon consent of the Lenders to the relief requested in the Motion and provided for by this Order; and it appearing that notice of the Motion was adequate and proper under the circumstances, and it appearing that no other or further notice need be given;

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

1.     **Effectiveness of Order.**  The effectiveness of this Order shall be conditioned upon this Order being entered on the Court's docket no later than September 17, 2009. Reference to the date this Order is entered on the Court's docket shall be, the "**Approval Date**."

2.     **Disposition of the Conversion Motion and the Bank Account Transfer Motion; Disposition Concerning the Cash Collateral Disputes; and Use of Cash Collateral.**  The Conversion Motion and the Bank Account Transfer Motion are deemed moot by virtue of the provisions of this Order.  So long as there is no Event of Default (as defined below in Paragraph 12 of this Order), the Lenders shall not be entitled to seek to have these Cases dismissed or converted to cases under chapter 7.  Any permitted use of any

funds of the Debtors' estates pursuant to the provisions of the January 8th Cash Collateral Order or otherwise shall be deemed terminated as of the Approval Date, and the Debtors and their estates shall be entitled to the use of funds only to the extent expressly permitted in Paragraphs 3(c) through 3(g) and 4 of this Order (but, in all instances, such use of funds shall be subject to Paragraph 5 of this Order).

3. **Distribution of Current Cash; Limited Use of Cash Collateral; and Retention by the Debtors of certain Chase Cash.** With regard to all of the cash in the possession of the Debtors as of August 25, 2009 (the "**Current Cash**"); no later than September 18, 2009, the Current Cash shall be distributed by the Debtors and applied and/or used (as applicable), as follows:

(a) An amount equal to the greater of (i) the amount of Current Cash *minus* $3,638,506 and (ii) $3,300,000 shall be transferred to the Lenders (free and clear of any liens, claims, and encumbrances), which amount is to be applied by the Lenders to reduce the Pre-Petition Revolving Credit Obligations and Post-Petition Obligations in accordance with the provisions of the Interim DIP Order;

(b) $400,000 shall be transferred, free and clear of any liens, claims, and encumbrances, to Lenders' counsel, Klee, Tuchin, Bogdanoff & Stern LLP, to cover incurred and to-be-incurred unpaid fees and expenses of professionals of the Lenders (which professionals shall not be required to seek Court approval with respect to any fees or expenses incurred prior to, during or following the Cases), and, to the extent not fully used for such purpose, any excess shall be transferred to the Lenders (free and clear of any liens, claims, and encumbrances), which amounts are to be applied by the Lenders to reduce the

Pre-Petition Revolving Credit Obligations and Post-Petition Obligations in accordance with the provisions of the Interim DIP Order;

(c)        $700,000, constituting the Lenders' cash collateral,[4] shall be transferred to a segregated account at a bank of the Debtors' choice to cover incurred but unpaid Court-allowed professional and KCC[5] fees and expenses and fees of the United States Trustee, in each instance incurred through July 31, 2009 including holdbacks (provided, however, any Court-allowed fees and expenses of any of the Committee's professionals related to pursuit of the Litigation Claims shall only be paid out of the Litigation Fund); with any excess amounts first to be used by the Debtors and their estates to fund any Court-allowed professional fees and expenses permitted to be paid under Paragraph 3(d), if necessary, and, then (but, in all instances, subject to the Backstop Cap (defined in Paragraph 5 of this Order)), any allowed chapter 11 administrative claims (provided that no portion of the $700,000 shall be used to fund fees or expenses incurred after August 30, 2009 with respect to the negotiation, preparation, confirmation, or solicitation of acceptances of a plan of liquidation for one or more of the Debtors (a "**Plan**")), and, to the extent not fully used for such purposes, any excess[6] shall be promptly, but not later than five (5) Business Days[7] after

---

[4]    The $700,000 is a carve-out from the Lenders' collateral and shall not be used for any purpose whatsoever other than the payment of all Court-allowed fees and expenses incurred by professionals, KCC fees and expenses, and fees of the United States Trustee, in each instance incurred through July 31, 2009, unless and until all such Court-allowed fees and expenses have been paid in full, in which case the remainder shall be used as otherwise permitted in this subparagraph (c).

[5]    The term "**KCC**" means Kurtzman Carson Consulting LLC.

[6]    The Lenders shall retain their Revolving Credit Pre-Petition Liens and Post-Petition Liens as against the  $700,000 to secure their right to receive any such excess, but consent to the use of the  $700,000 as set forth herein, which $700,000 shall be a carve-out from the Lenders' collateral to the extent used in accordance with this subsection (c).

the first date such excess exists and the Debtors or the Committee is aware thereof or reasonably should have been aware thereof, transferred to the Lenders (free and clear of any liens, claims, and encumbrances), which amounts are to be applied by the Lenders to reduce the Pre-Petition Revolving Credit Obligations and Post-Petition Obligations in accordance with the provisions of the Interim DIP Order. Any objections to requests for payment of interim compensation that may have been lodged shall be deemed withdrawn, and any payments that would be due and owing but for such objections shall be made promptly after the Approval Date;

(d) $300,000, constituting the Lenders' cash collateral[8], shall be transferred to a segregated account at a bank of the Debtors' choice to cover incurred but unpaid Court-allowed professional and KCC fees and expenses and fees of the United States Trustee, in each instance incurred on and after August 1, 2009 including holdbacks (provided, however, any Court-allowed fees and expenses of any of the Committee's professionals related to pursuit of the Litigation Claims shall only be paid out of the Litigation Fund ); with any excess amounts first to be used by the Debtors and their estates to fund any Court-allowed professional fees and expenses permitted to be paid under Paragraph 3(c), if necessary, and, then (but, in all instances, subject to the Backstop Cap (defined in Paragraph 5 of this

---

[7]    The term "**Business Day**" means any day that is not a Saturday, a Sunday or a day on which banks are required or permitted to be closed in the State of New York.

[8]    The $300,000 is a carve-out from the Lenders' collateral and shall not be used for any purpose whatsoever other than the payment of all Court-allowed fees and expenses incurred by professionals, KCC fees and expenses, and fees of the United States Trustee, in each instance incurred on and after August 1, 2009 (including up to $75,000 to fund fees or expenses incurred after August 30, 2009 with respect to the negotiation, preparation, confirmation, or solicitation of acceptances of a Plan), unless and until all such Court-allowed fees and expenses have been paid in full, in which case any remainder shall be used as otherwise permitted in this subparagraph (d).

Order)), any allowed chapter 11 administrative claims (provided that no more than $75,000 of the $300,000 shall be used to fund fees or expenses incurred after August 30, 2009 with respect to the negotiation, preparation, confirmation, or solicitation of acceptances of a Plan), and, to the extent not fully used for such purposes, any excess[9] shall be promptly, but not later than five (5) Business Days after the first date such excess exists and the Debtors or the Committee is aware thereof or reasonably should have been aware thereof, transferred to the Lenders (free and clear of any liens, claims, and encumbrances), which amounts are to be applied by the Lenders to reduce the Pre-Petition Revolving Credit Obligations and Post-Petition Obligations in accordance with the provisions of the Interim DIP Order;

(e)     $50,000 shall be transferred to a segregated account at a bank of the Debtors' choice to be used to fund allowed non-professional chapter 11 administrative expenses incurred after the Approval Date, with any excess (but, in all instances, subject to the Backstop Cap (defined in Paragraph 5 of this Order)) to be used by the Debtors and their estates to fund any allowed chapter 11 administrative claims (provided that no portion of the $50,000 shall be used to fund fees or expenses incurred after August 30, 2009 with respect to the negotiation, preparation, confirmation, or solicitation of acceptances of a Plan), and, to the extent not fully used for such purpose, any excess[10] shall be promptly, but not later than five (5) Business Days after the first date such excess exists and the Debtors or the

---

[9]     The Lenders shall retain their Revolving Credit Pre-Petition Liens and Post-Petition Liens as against the $300,000 to secure their right to receive any such excess, but consent to the uses of the $300,000 as set forth in this subparagraph (d), which $300,000 shall be a carve-out from the Lenders' collateral to the extent so used.

[10]    The Lenders shall retain their Revolving Credit Pre-Petition Liens and Post-Petition Liens as against the $50,000 to secure their right to receive any such excess, but consent to the use of the $50,000 as set forth herein.

Committee is aware thereof or reasonably should have been aware thereof, transferred to the Lenders (free and clear of any liens, claims, and encumbrances), which amounts are to be applied by the Lenders to reduce the Pre-Petition Revolving Credit Obligations and Post-Petition Obligations in accordance with the provisions of the Interim DIP Order;

(f)     $50,000 shall be transferred to a segregated account at a bank of the Debtors' choice to be used to fund amounts that may be permitted to be paid in respect of compensation and expenses of any chapter 7 trustee appointed in these cases, and, to the extent not fully used for such purpose, any excess[11] shall be promptly, but not later than five (5) Business Days after the first date such excess exists and the Debtors or the Committee is aware thereof or reasonably should have been aware thereof, transferred to the Lenders (free and clear of any liens, claims, and encumbrances), which amounts are to be applied by the Lenders to reduce the Pre-Petition Revolving Credit Obligations and Post-Petition Obligations in accordance with the provisions of the Interim DIP Order; and

(g)     $2,538,506, or such lesser amount as is available out of Current Cash after the Debtors have distributed the amounts set forth in Paragraphs 3(a) - 3(f), shall be transferred to a segregated account at a bank of the Debtors' choice to cover certain specific incurred but unpaid allowed chapter 11 administrative claims as of the Approval Date (collectively, the "**Exhibit Claims**" and each, an "**Exhibit Claim**")[12], and, to the extent not

---

[11]   The Lenders shall retain their Revolving Credit Pre-Petition Liens and Post-Petition Liens as against the $50,000 to secure their right to receive any such excess, but consent to the use of the $50,000 as set forth herein.

[12]   The Lenders, the Debtors and the Committee have approved a schedule of the Exhibit Claims, which was made available to the Court and the United States Trustee, but is not attached hereto or made more broadly available to protect the confidential and sensitive nature of the information contained therein. Upon reasonable request of appropriate parties, which would not include any parties whose

fully used for such purpose, any excess shall be distributed as follows: when a Exhibit Claim is paid, dismissed, settled, or otherwise liquidated, (1) 60% of any excess[13] cash held on account of such claim shall promptly (but no later than the Wednesday of the week following the week in which such claim is paid, dismissed, settled or otherwise liquidated) be transferred by the Debtors' estates to the Lenders (free and clear of any liens, claims, and encumbrances), which amounts are to be applied by the Lenders to reduce the Pre-Petition Revolving Credit Obligations and Post-Petition Obligations in accordance with the provisions of the Interim DIP Order; and (2) the remaining 40% shall be retained by the Debtors to fund any allowed chapter 11 administrative claims whether an Exhibit Claim or not (but, in all instances, subject to the Backstop Cap (defined in Paragraph 5 of this Order)) provided that no portion of the $2,538,506 shall be used to fund fees or expenses incurred after August 30, 2009 with respect to the negotiation, preparation, confirmation, or solicitation of acceptances of a Plan, and, to the extent the remaining 40% is not fully used to satisfy allowed chapter 11 administrative claims, any excess[14] shall be promptly, but not later than five (5) Business Days after the first date such excess exists and the Debtors or the Committee is aware thereof or reasonably should have been aware thereof, transferred to the Lenders (free and clear of any liens, claims, and encumbrances), which amounts are to be

---

claim may be on such schedule, the Debtors would share such letter agreement provided such parties execute reasonable confidentiality agreements to protect the confidentiality of such information.

[13]   The Lenders shall retain their Revolving Credit Pre-Petition Liens and Post-Petition Liens as against the $2,538,506 (or such lesser amount as is available) to secure their right to receive any such excess, but consent to the use of the $2,538,506 (or such lesser amount as is available) as set forth herein.

[14]   The Lenders shall retain their Revolving Credit Pre-Petition Liens and Post-Petition Liens as against the $2,538,506 (or such lesser amount as is available) to secure their right to receive any such excess, but consent to the use of the $2,538,506 (or such lesser amount as is available) as set forth herein.

applied by the Lenders to reduce the Pre-Petition Revolving Credit Obligations and Post-Petition Obligations in accordance with the provisions of the Interim DIP Order. By way of illustration only, if a $220,000 Exhibit Claim is liquidated in the amount of $120,000; then (x) the Lenders shall receive $60,000 (60% of the $100,000 excess amount), free and clear of any liens, claims, and encumbrances, by Wednesday of the week following the week in which such claim is liquidated, and (y) the Debtors shall be entitled to retain $40,000 (40% of the $100,000 excess amount), subject to the aforementioned terms and conditions.

(h)     In addition, subject to the terms, conditions and limitations set forth in the next sentence, the Debtors shall be entitled to retain the first $410,000 of cash received by the Debtors (the "**Initial Chase Cash**") from the cash in the amount of $960,000 which is currently being held by Chase (the "**Chase Funds**") as "adequate protection" for alleged overdraft liability of the Debtors, in accordance with that certain "Final Order Authorizing Continued Use Of Existing Bank Accounts, Cash Management System, And Checks And Business Forms," dated December 22, 2008" [Docket # 211] (the "**Chase Stipulation**"), and which is likely to be released by Chase in accordance with the terms of a settlement agreement which is currently being negotiated (the final, executed and approved version of any such settlement agreement, "**Chase Settlement**"). The Debtors' right to retain the Initial Chase Cash is conditioned upon such cash being transferred to the segregated account referenced in Paragraph 3(g) and used for the purposes, and subject to the terms, conditions and limitations set forth in Paragraph 3(g), with any excess[15] to be promptly, but no later than

---

[15]   The Lenders shall retain their Revolving Credit Pre-Petition Liens and Post-Petition Liens as against the $410,000 to secure their right to receive any such excess, but consent to the use of the $410,000 as set forth herein., as such $410,000, and the use thereof, shall be a carve-out from the Lenders' collateral to the extent used in accordance with Paragraph 3(g) above.

five (5) Business Days after receipt thereof, transferred to the Lenders (free and clear of any liens, claims, and encumbrances), which amounts are to be applied by the Lenders to reduce the Pre-Petition Revolving Credit Obligations and Post-Petition Obligations in accordance with the provisions of the Interim DIP Order.

4.     **Future Cash (Disclosed by the Debtors); Limited Use of Cash Collateral.**

Upon receipt of any Disclosed Future Cash (defined below), the Debtors shall (a) promptly, but no later than five (5) Business Days after receipt thereof, distribute 75% of any such Disclosed Future Cash to the Lenders (free and clear of any liens, claims, and encumbrances), which amounts are to be applied by the Lenders to reduce the Pre-Petition Revolving Credit Obligations and Post-Petition Obligations in accordance with the provisions of the Interim DIP Order and (b) retain 25% of any such cash to fund any shortfalls in the funds established in Paragraphs 3(c), 3(d) and 3(g) hereof to pay allowed chapter 11 administrative claims (but, in all instances, subject to the Backstop Cap (defined in Paragraph 5 of this Order)), provided that no portion of the Disclosed Future Cash shall be used to fund fees or expenses incurred after August 30, 2009 with respect to the negotiation, preparation, confirmation, or solicitation of acceptances of a Plan. "**Disclosed Future Cash**"[16] shall consist solely of:

(a)     Any cash received by the Debtors which constitutes Chase Funds, but excluding any of the Initial Chase Cash;[17]

---

[16]    The Lenders shall retain their Revolving Credit Pre-Petition Liens and Post-Petition Liens against the Disclosed Future Cash to secure their right to receive any amounts it is entitled to receive pursuant to the provisions of this Order, but consent to the use of the Disclosed Future Cash as set forth herein.

[17]    Upon entry of an Order by this Court approving the Chase Settlement, Chase is hereby ordered to disburse the Chase Funds to the Debtors and Ableco in accordance with the terms and provisions of this Order.

(b)     Any cash received by the Debtors from cash in an amount up to $1,000,000 which is currently being held by the Debtors' credit card processor, Priority Payment Systems, LLC, pursuant to that certain "Stipulation and Order with Priority Payment Systems, LLC," dated January 20, 2009 [Docket # 279];

(c)     Any cash received by the Debtors which is held by Stone Barn Manhattan LLC and its affiliates, the debtors and debtors-in-possession with chapter 11 bankruptcy cases currently pending in the Southern District of New York, with cases being jointly administered under Case No. 08-12579 ALG (the "**Stone Barn Debtors**"), in accordance with that certain "Stipulation, Agreement and Order, by and among Stone Barn Manhattan LLC and its Debtor Affiliates on the One Hand and BH S&B Holdings LLC and its Debtor Affiliates and Ableco Finance LLC on the Other Hand," dated November 24, 2008 [Docket # 79]; and

(d)     Any proceeds received by the Debtors from insurance coverage related to approximately $160,000 in property stolen from their distribution center in Columbus, Ohio.

5.     **Limitation on Backstop Funds**.  Notwithstanding anything to the contrary in this Order, the amount of "excess" funds that can be used to pay chapter 11 administrative claims (as described in Paragraphs 3(c), 3(d), 3(e), 3(g) and 4 above, the "**Backstop Funds**") shall not exceed $625,000 in the aggregate (with such aggregate amount being the "**Backstop Cap**"), and if the amount of Backstop Funds available to the Debtors and their estates, together with any Backstop Funds already used, at any time exceeds $625,000, any such excess amounts shall promptly, but not later than five (5) Business Days after the date such excess exists, be transferred to the Lenders (free and clear of any liens, claims, and

encumbrances), which amounts are to be applied by the Lenders to reduce the Pre-Petition Revolving Credit Obligations and Post-Petition Obligations in accordance with the provisions of the Interim DIP Order.

6. **All Other Cash; No Use.** Except as otherwise expressly provided in this Order, 100% of any amounts currently in the Debtors' possession and 100% of any amounts received by the Debtors after the date hereof (collectively, "**Other Cash**") shall be immediately transferred to the Lenders, free and clear of any liens, claims, and encumbrances.

7. **Reallocation of GUC Litigation Recoveries.** Notwithstanding anything to the contrary in the January 8th Cash Collateral Order, the GUC Litigation Recoveries may be used, only with the consent of the Committee or its designee, to fund allowed chapter 11 administrative expenses (including approved professional fees and expenses), priority, and/or general unsecured claims, or to fund fees or expenses incurred after the date hereof with respect to the negotiation, preparation, confirmation, or solicitation of acceptances of a Plan.

8. **Survival of the Lenders' Claims**. The Lenders' claims against the Debtors and their estates under the Interim DIP Order shall remain unaffected by the provisions of this Order (except to the extent the amount of such claims are reduced by virtue of any amounts received by the Lenders pursuant to the terms hereunder, which are to be applied by the Lenders to reduce the Pre-Petition Revolving Credit Obligations and Post-Petition Obligations in accordance with the provisions of the Interim DIP Order). Notwithstanding anything to the contrary in the immediately preceding sentence, so long as the Debtors and the Committee are in compliance with their obligations under this Order, (a) the Lenders' claims shall not be payable out of the GUC Litigation Recoveries, and (b) the Lenders'

unpaid administrative claims shall not need to be satisfied under a Plan, provided, and only if, the Plan expressly assumes and incorporates in full the terms and provisions of this Order and provides for the liquidating trust (and/or any other entity that will survive confirmation for purposes of objecting to claims, disbursing funds, and prosecuting claims held by the Debtors' estates including, without limitation, the Litigation Claims) to observe, in full, the terms and provisions of this Order, unless otherwise agreed by the parties in writing in their sole and absolute discretion.

9. **Continuing Full Force and Effectiveness of Previously Entered Orders**. Save and except as otherwise provided in this Order and the January 8th Cash Collateral Order, the Interim DIP Order shall remain in full force and effect. Save and except as otherwise expressly provided for in this Order, the January 8th Cash Collateral Order shall remain in full force and effect.

10. **Reporting / Information Requests**. Not later than Wednesday of each week, the Debtor (through RAS Management Advisors, LLC ("**RAS**"), or another person or entity reasonably acceptable to the Lenders, which shall include CBIZ Mahoney) shall provide a report showing (with respect to the immediately preceding calendar week ending Saturday and cumulatively as of the date of the Approval Order to and through the immediately preceding calendar week ending Saturday): (a) an accounting of the funds in each of the segregated accounts described in Paragraphs 3(c) through 3(g) (including account balance information and sources and uses) and an accounting of any Disclosed Future Cash and any Other Cash (including balance information, as applicable, and sources and uses), and (b) the status of the Exhibit Claims which indicates whether such claims have been paid (and, if so, how much), dismissed, settled (and, if so, on what terms), or otherwise liquidated (and, if so,

in what amount) and, in connection therewith, the amount of any excess cash held on account of such claims.  All reports to be furnished to the Lenders pursuant to this Paragraph 10 shall be in a form reasonably acceptable to the Lenders.  In addition, promptly upon the request by the Lenders (but not later than five (5) Business Days after the date of such request), the Debtors shall provide information concerning any claims that have been asserted against the Debtors' and their estates including, without limitation, copies or summaries of any and all information contained in the Debtors' books and business records and any and all non-privileged information and analysis relating thereto (in the possession of or generated by any of the Debtors) with regard to any such claims; provided, however, that if the requested information or documents are in storage, the Debtors shall use reasonable best efforts to obtain such information or documents within five (5) Business Days and shall provide such information or documents to the Lenders not later than two (2) Business Days of obtaining such information or documents from storage.  To the extent the reports or other information required by this paragraph is not delivered in accordance with this paragraph, then no professionals of the Debtors' or the Committee, including RAS, shall be entitled to continued interim or any other compensation during the Cases until the failed or deficient delivery is cured.

11. **[Intentionally Omitted**.]

12. **Events of Default**.  The occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "**Event of Default**" under this Order:

(a) The Debtors fail to make any payment to the Lenders when due pursuant to the provisions of this Order (a "**Payment Default**"), and either

(i)       such Payment Default is the first Payment Default under this Order and remains unremedied for three (3) Business Days or more following the receipt by counsel for the Debtors and Committee of written notice of such failure (via email to Joel Levitin and Richard Stieglitz of Cahill Gordon Reindel LLP and Robert Hirsh of Arent Fox LLP) <u>or</u>

(ii)      such Payment Default is the Debtors' second Payment Default under this Order;

(b)      Other than a Payment Default, the Debtors and/or the Committee fail(s) or neglect(s) to perform, keep or observe any of the provisions of this Order including, without limitation, any of the reporting requirements contained in Paragraph 10 of this Order (a "**Non-Payment Performance Default**"), and <u>either</u>

(i)       such Non-Payment Performance Default is the first or second Non-Payment Performance Default under this Order and, and in either instance, remains unremedied for three (3) Business Days or more following the receipt by counsel for the Debtors and Committee of written notice of such failure (via email to Joel Levitin and Richard Stieglitz of Cahill Gordon Reindel LLP and Robert Hirsh of Arent Fox LLP), <u>or</u>

(ii)      if such Non-Payment Performance Default is the third Non-Payment Performance Default under this Order; or

(c)      Any written statement, report, or financial statement made or delivered to any of the Lenders by any of the Debtors or the Committee is knowingly untrue or incorrect in any material respect as of the date when made.

(d)      A Plan and accompanying disclosure statement (unless the requirement for a disclosure statement shall have been waived in advance by order of the Court) shall not

have been filed and served on or before December 31, 2009, unless such date is extended in writing by Ableco in its sole and absolute discretion.

(e)     A Plan consistent with the terms of Paragraph 8(b) above shall not have been effectuated on or before April 15, 2010, unless such date is extended in writing by Ableco in its sole and absolute discretion.

13.     **Exercise of Remedies.**  If an Event of Default has occurred, the Lenders shall be entitled to a hearing on a motion to convert the Cases on five (5) Business Days' written notice (electronically, including via facsimile or email, in a manner that generates a receipt for delivery or via overnight mail) to the Office of the United States Trustee for the Southern District of New York, counsel to the Debtors, and counsel to the Committee. At said hearing, the only issue that the Court shall consider is whether, in fact, an Event of Default has occurred under the provisions of this Order; and if the Court determines that an Event of Default has, in fact, occurred, then the Cases shall be immediately converted to cases under Chapter 7.  In addition, each of the Lenders shall be entitled to exercise any rights and enforce any remedies available it to enforce the provisions of this Order in the event of any breach or default hereunder (and without regard to whether an Event of Default has occurred) including, without limitation, the right to compel the Debtors and/or Committee to perform under this Order.  The Debtors (on behalf of themselves and their estates) and the Committee (on behalf of the estates) have waived any and all rights they may be entitled to assert under Section 105 of the Bankruptcy Code to challenge any effort by the Lenders to convert these Cases as a result of an Event of Default, or to strictly enforce the terms of this Order.

14.     **Non-Waiver of Rights.**  The failure or delay by any of the parties to this Order to seek relief or otherwise exercise their rights and remedies under this Order shall not constitute a waiver of any of their rights or remedies hereunder.

15.     **Release.**  The Debtors (on behalf of themselves and their estates) and the Committee shall, and are hereby deemed to, forever fully and irrevocably waive, release and discharge each of the Lenders and, in each case, any and all affiliated, parent or subsidiary entities, past and present and all of their respective officers, directors, agents, employees, attorneys, representatives, shareholders, members, partners, predecessors and successors, past and present, of any and all of the foregoing, from any and all claims (as such term is defined in Section 101 of the Bankruptcy Code), obligations, demands, actions, suits, judgments, damages, causes of action, liabilities, costs, expenses and damages of any kind whatsoever, in law or in equity, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, in each case, arising out of or otherwise relating to any matter, fact, transaction, act or inaction which first arose prior to or on the Approval Date.  The foregoing release shall not be construed to preclude the ability of the Debtors or Committee to enforce the provisions of this Order.

16.     **No Third Party Rights.**  This Order shall not be construed to confer any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

17.     **Binding Effect of Order.**  Immediately upon execution by this Court, the provisions of this Order shall be valid and binding upon the Lenders, Debtors' estates, all other creditors of any of the Debtors, the Committee, and all other parties in interest and their respective successors and assigns including any chapter 7 trustee or other trustee or fiduciary

hereafter appointed as a legal representative of any of the Debtors, or with respect to any property of the Debtors' estates, in any of the Cases including any chapter 7 cases for the Debtors' estates.

18.     **Order Effective Immediately Upon Entry.**  This Order shall be effective immediately upon entry notwithstanding any rule, including without limitation, Fed. R. Bankr. P. 4001(a)(3) and 6004(g), to the contrary.

**CAHILL GORDON & REINDEL LLP**                    **ARENT FOX LLP**


        /s/ Joel H. Levitin                                    /s/ Robert M. Hirsh
Joel H. Levitin                                              Schuyler G. Carroll
Richard A. Stieglitz Jr.                                  Robert M. Hirsh
Eighty Pine Street                                        1675 Broadway
New York,  New York 10005                      New York, New York  10019
Telephone:  (212) 701-3000                       Telephone:  (212) 484-3900
Facsimile:  (212) 269-5420                         Facsimile:  (212) 484-3990

Attorneys for the Debtors                           Attorneys for the Committee

**KLEE, TUCHIN, BOGDANOFF &
STERN LLP**


        /s/ Jonathan S. Shenson
Michael L. Tuchin
Jonathan S. Shenson
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone:  (310) 407-4000
Facsimile:  (310) 407-9090

Attorneys for the Lenders


Dated:  New York, New York
        **September 16, 2009**                                        /s/ Martin Glenn
                                                              UNITED STATES BANKRUPTCY JUDGE